Dora Mae **WILLIAMS**, et al.,
Plaintiffs, Appellees,

v.

Charles M. **ATKINS**, Commissioner, Massachusetts Department of Public Welfare, Defendant, Appellant.

No. 85–1522.

United States Court of Appeals, First Circuit.

Argued Dec. 3, 1985.
Decided March 21, 1986.

Kim E. Murdock, Asst. Atty. Gen., with whom Francis X. Bellotti, Atty. Gen., and Carl Valvo, Asst. Atty. Gen., Boston, Mass., were on brief, for defendant, appellant.

Steven Savner, Mass. Law Reform Institute, Boston, Mass., was on brief, for plaintiffs, appellees.

Before COFFIN, BREYER, and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

In 1976, a class action suit was filed in the federal district court of Massachusetts on behalf of food stamp applicants and recipients, alleging violations of the Food Stamp Act of 1964. The plaintiff class alleged that the defendant, Commissioner of the Massachusetts Department of Public Welfare, failed to issue immediately food stamp authorization-to-purchase cards to households eligible for food stamps and in immediate need of assistance. A consent decree was entered into and filed in November, 1976. The decree established procedures whereby food stamp recipients in dire need of assistance would receive authorization-to-purchase cards "over the counter", that is, upon request at their local welfare offices.

In 1982, Congress amended the Food Stamp Act, so that it conflicted in part with the terms of the consent decree. The Commissioner, bound by inconsistent legal requirements, sought to vacate the consent decree. The district court denied the Commissioner's motion for relief from judgment, and the Commissioner appealed. For the reasons discussed below, we reverse and vacate the consent decree.

I.

The Food Stamp Act was passed in 1964 and was designed to enable needy households to receive public assistance in the purchase of food. 7 U.S.C. §§ 2011–2025 (1970). At the national level, the program is administered by the Food and Nutrition Service (FNS) of the Department of Agriculture. The FNS is charged with overseeing the operation of the food stamp programs in the various states and with establishing national eligibility standards. States have a choice as to whether they will participate in the food stamp program, but once a state decides to participate, it is bound to follow the federal requirements.[1] Massachusetts elected to participate in the food stamp program and thus subjected itself to the requirements of the federal statute and regulations in operating its program.

In many states, including Massachusetts, the participating households were not issued food stamps directly by the issuing agency (in Massachusetts, the Department of Public Welfare). Instead, they were given an Authorization to Purchase (ATP) card,[2] which stated on its face the amount that the household was entitled to purchase and the purchase requirement.[3] The par-

---

1. The federal government pays for all of the benefits provided to participants and reimburses the states for half of the costs of administering the program.

2. Commonly known as ATP cards, these cards are authorization (to a certified household) to purchase food stamps at less than face value. These cards are valid for either two weeks or one month. *Tyson v. Maher,* 523 F.2d 972, 974 n. 2 (2d Cir.1975).

3. In 1976, eligible households purchased stamps at less than their face value. The number of stamps they were entitled to purchase and the amount they paid for them was determined on the basis of nationally established standards. The amount that households paid was called the "purchase requirement".

The purchase requirement has since been eliminated. Households are now issued issued food stamps of varying value with no purchase requirement. ATP cards remain as an intermediate document authorizing a household to re-

ticipating household took the ATP card to a food stamp issuing center, paid the purchase price, and surrendered the card.

Plaintiffs filed their class action suit in July, 1976, on behalf of all food stamp applicants and recipients, against the Commissioner of the Massachusetts Department of Public Welfare. Plaintiffs alleged that by "failing to provide immediate issuance of food stamp authorization to all households eligible for food stamps who stand in immediate need of food assistance", the Commissioner was violating the Food Stamp Act of 1964, and the regulations promulgated thereunder by the FNS. Specifically, plaintiffs challenged the Commissioner's failure to provide a system whereby initial and replacement ATP cards could be provided over-the-counter at local welfare offices to eligible recipients in immediate need of assistance.

The district court granted the plaintiffs' motion for a temporary restraining order, requiring the Commissioner to "deliver forthwith to the named plaintiff [sic] their ATP cards" and "to implement 'over-the-counter' delivery of ATP cards to eligible food stamp households in immediate need of assistance." The parties began settlement negotiations and, in November, 1976, the consent decree agreed upon by the parties was entered as an order by the district court. The consent decree provided for over-the-counter issuance of ATP cards to the four groups that formed the plaintiff class.[4]

Federal food stamp law and accompanying regulations were amended several times after entry of the consent decree. Most significant is the 1982 amendment to the Act, which restricts the state's ability

to provide expedited service to food stamp households. 7 U.S.C. §§ 2011–2029 (Supp. 1985). In November, 1984, the Commissioner filed a motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(5) and (6),[5] seeking to vacate the consent decree on the ground that over-the-counter issuance of ATP cards to the plaintiff class as required by the decree now violated federal law. The motion was supported by an affidavit stating that the FNS had formally notified the Commissioner that it intended to suspend or disallow federal funds unless the state discontinued the practice of same-day issuance of ATP cards to the plaintiff class.

The plaintiffs opposed the Commissioner's motion to vacate the decree, arguing that the decree should be modified to provide the plaintiff class with expedited delivery in a manner not in conflict with federal law. A hearing was held before the district court, and, after being informed of the parties' inability to negotiate a modified decree, the district court denied the Commissioner's motion, without prejudice to future motions to modify the decree. The Commissioner appeals from that decision.

## II.

It is uncontested that the district court had the power to modify or vacate the consent decree in this case. As early as 1932, in *United States v. Swift*, 286 U.S. 106, Justice Cardozo stated:

"We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.... A continuing decree of injunction directed to

ceive its allotment of food stamps. These cards are now called Authorization to Participate cards.

**4.** The plaintiff class was certified on November 19, 1976, and is composed of these four categories of food stamp households: applicant households who qualified for a "zero-purchase" ATP card; "zero-purchase" recipients seeking a replacement ATP card; recipients with a purchase price requirement seeking a replacement ATP card; and food stamp applicants receiving pub-

lic assistance who would be entitled to a zero-purchase ATP card.

**5.** The relevant provisions of Rule 60(b) are as follows: "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: .... (5) ... it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

events to come is subject always to adaptation as events may shape the need." 286 U.S. at 114.

The court's power to alter or vacate a decree derives from the fact that a federal statutory or constitutional claim, enabled the court to enter the decree initially. *System Federation No. 91 v. Wright,* 364 U.S. 642, 651, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961). It is the statute or the constitutional provisions that the decree intended to enforce, "and only incidentally the parties", that the court serves in entering a decree. *Id.*

Necessarily, federal courts have the power "to continue to further the objectives of that Act when its provisions are amended." *Id.* And litigants cannot agree to be bound by a decree regardless of future changes in federal law. "The parties could not become the conscience of the equity court and decide for it once and for all what was equitable and what was not, because the court was not acting to enforce a promise but to enforce a statute." *Id.* at 652–53, 81 S.Ct. at 374.

Two opinions of this court provide guidance in determining whether a decree need be modified or vacated in light of changed circumstances. In *Theriault v. Smith,* 523 F.2d 601 (1st Cir.1975), a consent decree had been entered in 1974 granting AFDC benefits to the plaintiffs. The legal basis for the decree had been our interpretation of a federal statute. When the Supreme Court rejected our view of the statute, the defendant moved to vacate the decree, pursuant to Rule 60(b)(5). In affirming the district court's decision to vacate the consent decree, we observed that a subsequent. Supreme Court opinion had represented a fundamental change in the legal predicates of the consent decree. We stated: "[i]t may well be unreasonable to require defendant, for the indefinite future, to abide by a consent decree based upon an interpretation of law that has been rendered incorrect by a subsequent Supreme court decision." *Id.* at 602.

In *Coalition of Black Leadership v. Cianci,* 570 F.2d 12 (1st Cir.1978), we reviewed a consent decree that had been entered as a result of a class action suit filed on behalf of black residents of Providence, alleging various civil rights violations by police officers and public officials. The 1973 decree established a procedure whereby residents' complaints against police officers could be filed, investigated, and resolved. In 1976, a state law was enacted (the Law Enforcement Officers' Bill of Rights) that required certain procedures to be followed in the processing of civilian complaints against police officers. The district court denied the officers' motion to vacate the decree based on the recently enacted state law.

We affirmed. We found that the consent decree had been designed to protect the rights of citizens "to be free from 'racially discriminatory police conduct' ". *Id.* at 13. Thus, the legal foundation for the plaintiffs' claim had not in any way been affected by the enactment of the state law whose purpose was to protect police officers from an impairment of their rights when their conduct was questioned. We stated that despite the "obvious subject matter overlap between the decree and the legislation, it is also obvious that neither was developed to meet these dual and partially inconsistent purposes." *Id.* at 14. We rejected the officers' contention that the procedures required by the decree but not by the legislation were "so onerous that they amount to unfair hardships inflicted on police officers and yet are so marginal that they provide no additional protection to civilian complainants." *Id.* at 14.

These cases reflect competing considerations: on the one hand, the court cannot disregard substantial changes in law or fact that undermine the basis for the consent decree. On the other hand, the plaintiffs are entitled to continuing injunctive relief despite the occurrence of related, but not dispositive, changes in the circumstances surrounding the consent decree; neither the plaintiff nor the court should be burdened with reestablishing what has already been negotiated. *Jordan v. School District of City of Erie, Pennsylvania,* 548

F.2d 117, 121–22 (3d Cir.1977). Thus, in *Theriault*, we relieved the defendant of its obligation to provide plaintiffs with benefits, when the interpretation of law that served as the basis for the defendant's obligation had been rendered incorrect by the Supreme Court. In contrast, in *Cianci*, we found that where the constitutional theory underlying plaintiffs' claim had not been disturbed, but a state statute provided an independent basis for some of the relief provided by defendant, it was not necessary to undo the decree.

■ We thus turn to consideration of the district court's decision not to vacate the consent decree in this case. While keeping in mind the relevant considerations that guide us in determining whether to preserve, modify, or vacate a consent decree, we must also recognize constraints on our standard of review. The district court's refusal to exercise its power to vacate a consent decree under Fed.R.Civ.P. 60(b) is reviewable only for abuse of discretion. *Fortin v. Commissioner of Mass. Dept. of Public Welfare*, 692 F.2d 790, 798–89 (1st Cir.1982). Yet, "[d]iscretion is never without limits and these limits are often far clearer to the reviewing court when the new circumstances (advanced to justify vacating decree provisions) involve a change in law rather than facts". *Wright*, 364 U.S. at 648, 81 S.Ct. at 371. Moreover, in the instant case, the change is not decisional law, but statutory law, and derives from the very statute that the decree is intended to enforce. *See Wright*, at 651–52, 81 S.Ct. at 373.

The legal predicate of the consent decree in this case is the Food Stamp Act of 1964. It was the plaintiffs' contention in 1976 that the immediate issuance of initial and replacement ATP cards to households in dire need was required by the Act. Although the Act did not explicitly mention "expedited service", the plaintiffs supported their claim by identifying two provisions in the Act: one, that "eligible households within [a] State shall be provided with an opportunity to receive a nutritionally adequate diet", 7 U.S.C. § 2013(a) (1970); and two, that "all practicable efforts shall be made in the administration of the food stamp program to ensure that participants use their increased purchasing power to obtain those staple foods most needed in their diets" and that "the state agency shall undertake effective action ... [to] insure the participation of eligible households", 7 U.S.C. §§ 2019(a) & (e)(5) (1970). Plaintiffs also identified a regulation that permitted the states to immediately certify for thirty days and without verification households with a zero purchase requirement. 7 C.F.R. § 271.4(a)(2)(iii) (1975).

The consent decree provides relief in specific terms to redress violations of general statutory provisions. The essence of the decree is the immediate issuance of ATP cards to the plaintiff class. Expedited service for initial ATP cards was made available to zero-purchase-price households, that is, households that did not pay for their food stamps. Expedited service for replacement ATP cards was provided to all households, regardless of need. For both initial and replacement ATP cards, eligible households are entitled to receive their ATP cards "over-the-counter", that is, the same day, at local welfare offices. The decree does not contemplate any verification of eligibility factors.

■ Nothing remains of the specific statutory and regulatory provisions on which the plaintiffs relied. The statute itself has been replaced by the Food Stamp Act of 1982, the statutory scheme now in effect. In place of the requirement that states provide a "nutritionally adequate diet", the statute states that "[s]ubject to the availability of funds ... eligible households within the State shall be provided an opportunity to obtain a more nutritious diet". 7 U.S.C. § 2013(a) (Supp.1985). The other provisions of the 1964 Act on which plaintiffs relied have no equivalents. The implementing regulations have also changed drastically. Gone is the option of "certification pending verification".

Whereas the 1964 statute did not explicitly mention "expedited service", both the current statute and the current regulations

specifically address expedited service, and impose standards inconsistent with the consent decree. The Food Stamp Act Amendments of 1982 limits expedited service to two categories of food stamp households: households with gross income less than $150 per month, and destitute migrant or seasonal farmworker households. An additional requirement is that households in both categories may not have liquid resources in excess of one hundred dollars. 7 U.S.C. § 2020(e)(9)(A) (Supp.1985). The plaintiffs have conceded that the class as a whole is not eligible for expedited service. And households ineligible for expedited service must be processed according to normal standards. 7 C.F.R. § 273.2(i)(4)(v) (1985).[6]

Current law also specifically provides the time frame for expedited service. Rather than same-day provision, eligible households must be provided with food stamps no later than five days after the date of application. 7 U.S.C. § 2020(e)(9) (Supp. 1985).

While verification [7] of certain facts prior to issuance of ATP cards was not required by the federal act and regulations when the decree was entered, the Food Stamp Act of 1982 imposed verification requirements on expedited service processing. States are now required "to the extent practicable, (to) verify the income and liquid resources of the household prior to issuance" of benefits. 7 U.S.C. § 2020(e)(9)(B). The federal regulations require verification of identity in all cases and that "all reasonable efforts" shall be made to verify factors normally required for food stamps. 7 C.F.R. §§ 273.2(i)(4)(i)(A) & (B) (1985).[8] The regulations advise that the state "should issue

an ATP card prior to the expiration of the five days without completing the verification process only if it determines that such verification cannot be obtained within five days." 7 C.F.R. § 273.2(i)(4)(B) (1985). Identity must always be verified, however. 7 C.F.R. § 273.2(i)(4)(i)(A) (1985).

Current federal regulations also restrict the issuance of replacement ATP cards. Households that have lost their ATP cards after receipt cannot receive a replacement. 7 C.F.R. § 273.11(i)(3) (1985). ATP cards that were stolen, destroyed, or lost prior to receipt may be replaced as long as the household requests replacement within ten days. 7 C.F.R. §§ 273.11(i)(1) & (2) (1985); 7 C.F.R. § 274.2(h) (1985). Eligible households are to be issued their replacement cards within ten days of receipt of their request. 7 C.F.R. §§ 273.11(i)(1)(ii)(C) & (i)(2)(ii)(E) (1985). Prior to issuing a replacement card, the state agency must verify "to the maximum extent practicable" the validity of the request. 7 C.F.R. §§ 273.11(i)(2)(ii)(A) (1985). Moreover, replacement cards may not be issued more frequently than once every six months. 7 C.F.R. §§ 273.11(i)(2)(ii)(D) (1985).

As this discussion has shown, the legal foundation for the entry of the consent decree has changed substantially. Whereas the plaintiff class was arguably eligible for expedited service under the 1964 Act, it is clear that they are no longer eligible. The vast majority of households eligible for expedited service under the decree [9] do not qualify as households with *gross* income less than $150 per month, and with liquid resources less than $100. Even for the few households that are eligible, expedited ser-

---

6. The state has 30 days to process a household's application for food stamps under normal processing standards. For households in normal processing standards, the state must verify, through independent documents or third party contacts, all factors previously discussed. 7 U.S.C. § 2020(e)(3) (Supp.1985). In normal processing, because the verification is mandatory, the 30-day time frame gives way to the verification, unless the state has taken prescribed steps to obtain the information. 7 C.F.R. §§ 273.2(g)(3) & (h)(2) (1985).

7. Verification is the use of third-party information or documentation to establish the accuracy of statements on an application. 7 C.F.R. § 273.2(f) (1985).

8. These factors include residency, income, resources, alien status, social security number, and sometimes utility and medical expenses. 7 C.F.R. § 273.2(f)(1) (1985).

9. Because the purchase price requirement has been eliminated, the equivalent group is the zero-net-income household.

vice is no longer required to occur on the same day, but may take as long as five days. While the time frame of the current Act does not necessarily conflict with the timing embodied in the consent decree, the likelihood of conflict arises in conjunction with the Act's verification requirement. The consent decree does not contemplate verification of any eligibility factor, and the same-day issuance requirement makes unlikely any meaningful verification. In contrast, the 1982 Act embodies several verification requirements, even for households entitled to expedited service.

With the repeal of the Food Stamp Act of 1964 and the enactment of the Food Stamp Act Amendments of 1982, the legal predicate for the consent decree has changed so substantially that it is now without a foundation in current federal law and it in part conflicts with federal law. In these circumstances, we must conclude that the district court's decision to leave the decree intact was an abuse of discretion. In fact, both parties agree that the decree should not be enforced as written. Plaintiffs argue that the appropriate response to the change in the law is to modify the decree, rather than to vacate it, as the Commissioner urges.

Plaintiffs argue specifically that we should remove from the zero-net-income group the right to expedited service and substitute the right to immediate issuance of ATP cards once verification has been completed. This modification would permit these households to obtain assistance more quickly than by the normal processing standards. Plaintiffs claim they are entitled to the modification because it most completely implements the parties' intent as set forth in the decree, in light of the current changed circumstances.

Although plaintiffs made this argument at the hearing before the district court, they did not move for modification, nor take appeal from the district court's decision to leave the decree intact. Even disregarding these facts, we disagree with their suggestion. If we were to modify the decree, our obligation would be to do so in a manner consistent with the legal founda-

tion of the decree, and not necessarily with the parties' intent. The nature of the changes to the federal act and regulations would mean that any modification of the decree would closely resemble federal law. While a consent decree was previously needed to protect the plaintiffs' rights due to the 1964 Act's general guidelines as to eligibility, timing, and verification for expedited service, that is no longer the case. The Act provides specific guidelines, and there is no suggestion that the Commissioner would not follow the current law and regulations. If, instead, it is the plaintiffs' suggestion that they bargained in 1976 for more generous privileges than were provided under the Act, and thus should be entitled to maintain their advantage, we are unable to help them. Because we are confronted with a consent decree enforcing a statute, as opposed to a private contract, the "parties have no power to require of the court continuing enforcement of rights the statute no longer gives." *Wright,* 364 U.S. at 652, 81 S.Ct. at 373.

For the reasons discussed above, *the decision of the district court is reversed and the case is remanded with direction to vacate the consent decree.*